UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Cara Munn, et al.,<br>    Plaintiffs,<br><br>        v.<br><br>Hotchkiss School,<br>    Defendant. | No. 3:09cv919 (SRU) |

RULING ON MOTION IN LIMINE TO PRECLUDE INTRODUCTION OF A
WAIVER AND RELEASE OF LIABILITY

The primary plaintiff in this case, Cara Munn, was a fifteen year-old student on a school trip abroad when she was infected with an insect-borne disease. The disease left her permanently disabled. She, along with her parents, has sued the trip's sponsor, the Hotchkiss School, for damages that resulted from the school's alleged negligence. Plaintiffs now move to preclude introduction of a release signed by Cara and her mother prior to the trip. Plaintiffs have filed a motion in limine to preclude introduction of the release, arguing that it does not apply in this case. For the reasons set forth below, plaintiffs' motion in limine is GRANTED.

I.    BACKGROUND

In the spring of 2007, Cara Munn signed-up for a six-week summer enrichment program to be held principally in Tianjin, China. The trip was organized by Cara's boarding school, the Hotchkiss School. Three months prior to her departure, the school sent Cara and her parents a four-page "Agreement, Waiver, and Release of Liability." *Doc. # 143, Ex. C*. The waiver described the rules governing the trip, the grounds upon which the school could send a student home, and the risks attendant to foreign travel.

1

Towards the end, the document also set forth a "Release of Claims." This section first laid out the broad, general scope of the release in four bullet-pointed clauses. Cara and her parents would release the school from:

(1) "any and all claims that may arise from any cause whatsoever, whether resulting from acts or omissions of any persons, from the operation or condition of the facilities or premises, from acts of war or terrorism, or from acts of God or nature, or risks associated with the consumption of alcoholic beverages, use of illegal drugs in any form and injury or death from causes such as traffic accidents, crime, assault and theft,"

(2) "responsibility for any accident, illness, injury, or any other damage or consequence arising or resulting directly or indirectly from the Student's participation in the Program,"

(3) "any liability, damage, or injury that may be caused by Student's negligence or willful acts committed prior to, during or after participation in the Program," and

(4) "any liability, damage, or injury caused by the intentional or negligent acts or omissions of any other participant in the Program, or caused by any other person."

*Id.* This broad definition was subject to one exception; the release waived the school's liability "except to the extent that the liability, damage, injury, loss, accident or illness is caused by the sole negligence or willful misconduct of the School, its officers, trustees, faculty, employees, agents, or representatives." *Id.* Cara and her mother signed the document on March 7, 2007. The school conditioned students' participation in the Hotchkiss-in-China program on students and parents signing this release of claims.

Cara fell ill four weeks into her time in China. Doctors eventually diagnosed her with tick-borne encephalitis, a virus transmitted by an insect bite that causes swelling in the brain. As a result of her infection, Cara permanently lost her ability to speak, control her drooling, many of her fine motor skills, and some of her cognitive capacity. Cara and her parents allege that Cara's illness resulted from Hotchkiss's negligent planning and supervision of the China trip. Specifically, plaintiffs claim that the school failed to adequately warn students of the risk of

2

insect-borne disease, and failed to ensure that students take adequate precautions against insect-borne disease before and during the trip.

II. DISCUSSION

A. Unambiguous Waiver

As a general rule, Connecticut courts disfavor broad waivers of negligence liability. "Unless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability for his own negligent acts," the Connecticut Supreme Court has explained. *Hanks v. Powder Ridge Restaurant Corp.*, 276 Conn. 314, 322 (2005). A party cannot shed his ordinary responsibility "in the absence of language that expressly provides so." *Hyson v. White Water Mountain Resorts of Conn.*, 265 Conn. 636, 643 (2003). When evaluating a release or waiver, "[t]he question is whether an ordinary person of reasonable intelligence would understand that, by signing the agreement, he or she was releasing the defendants from liability for their future negligence." *Hanks*, 276 Conn. at 324-25. Though the Connecticut Supreme Court has never gone so far as to insist that a waiver use magic words, in general a waiver should refer to "negligence," or some close synonym, in order to clearly communicate its message. That is why the Court held an exculpatory clause that "explicitly used the word 'negligence' several times" to be sufficiently clear, while it refused to enforce a release that "only referred to risks involved in [an activity], but which made no reference to the possible negligence of the defendant." *Lewis v. Habitat for Humanity of Greater New Haven*, 2012 WL 386391 at *4 (Conn. Sup. Ct. 2012) (comparing *Hanks*, 276 Conn. 314, to *Hyson*, 265 Conn. 636).

In this case, an average person would not have understood the release to absolve Hotchkiss of liability for its careless acts. The portion of the waiver that lays out the release's

3

general scope never references Hotchkiss's basic responsibility to use reasonable precautions, and the exception to the waiver appears to carve out negligent or willful conduct by the school from the scope of the waiver.

The general scope is, of course, written quite broadly; it covers "any and all claims" and "acts or omissions of any persons," and waives "responsibility for" not just "any accident, illness, injury," but also "any other damage." But that broad language uses common words to describe breach ("an act or omission") and harm ("accident, illness, injury"), and never refers to a standard of care (by using a word like "negligence"). An ordinary person might interpret the release to shield Hotchkiss from most litigation, but would not know that Hotchkiss intended to eschew the most basic duty each of has to others—the duty to act with reasonable care, or, when referred to in the negative, not being negligent. This ambiguity is underscored by the clarity with which the release refers to the standard of care taken by others: it waives "any liability, damage, or injury that may be caused by *Student's negligence*" and "any liability, damage, or injury caused by the intentional or *negligent acts* or omissions of *any other participant* in the Program." (emphasis added). Thus, the release speaks with clarity about the "negligence" of everyone but the Hotchkiss School. Indeed, the natural reading of the waiver does not suggest that students are waiving the chance to proceed against the school in the event that Hotchkiss acts carelessly. Just the opposite – in the long, bullet-pointed list of things that could go wrong, it never once mentions that the school itself might be the one to make a mistake.

Even if the broad description of the waiver insulated the school from negligence liability, the exception to the waiver told the average reader that the waiver did not cover its negligence. The release states that the school will still be liable for any harm or damage "caused by the sole negligence . . . of the School, its officers, trustees, faculty, employees, agents, or

4

representatives." "Sole negligence" is a term of art, one that contrasts with "comparative fault," a legal concept that only ascribes liability to an actor for that portion of an accident that she can fairly be said to have caused. By using "sole negligence," the school may have intended to only remain liable when a jury found it one hundred percent responsible for an injury, a situation so rare that states have largely abandoned it as a threshold for assessing fault. But the school's intent does not matter. What matters is whether lay people, in this case a fifteen year-old student and her parents who lack legal training, would have understood that by only holding the school responsible for its "sole negligence," they were in effect waiving the school for any responsibility for its comparative fault. The answer can only be no. An average person would have reasonably believed that the school meant to remain responsible solely for any harm that its negligence caused.

Because the portion of the release that delineates its basic scope does not appear to waive the school's liability for its negligence, and because, in any event, the language that describes the release's exception appears to expressly limit the waiver with respect to the school's liability for negligence, the release is not enforceable in this case.

### B. Public Policy and Waivers of Negligence Liability

Even if the release contained an unambiguous waiver of negligence liability, it would still be void as a matter of public policy. The Connecticut Supreme Court has held that even a "well drafted exculpatory agreement . . . that releases [an entity] from prospective liability for personal injuries sustained as a result of [an entity's] negligence may violate public policy if certain conditions are met." *Reardon v. Windswept Farm*, 280 Conn. 153, 159 (2006). The Court first enunciated these criteria in *Hanks v. Powder Ridge Restaurant Corp.*, a case involving an accident on a dangerous slope used for snowtubing. There, the *Hanks* Court adopted the

California Supreme Court's six-factor test for assessing when a release offends the public interest, and held that a snowtube operator could not force a customer to release it of all negligence liability. 276 Conn. at 328 (borrowing standard enunciated in *Tunkl v. Regents of the University of California*, 60 Cal. 2d 92 (1963)). The *Hanks* Court reasoned that it could not enforce an exculpatory agreement when (1) it concerns a business suitable for regulation, (2) that business is performing a service of great public interest, (3) the business offers its services to the general public, (4) the party seeking exculpation has a decisive bargaining advantage, (5) the release is tantamount to a contract of adhesion, and (6) the release places purchaser under control of seller, and subject to the risk of the seller's carelessness. *Id.* at 328. The *Hanks* Court cautioned that no factor is dispositive, and that each case depends upon "the totality of the circumstances of any given case against the backdrop of current societal expectations." *Id.* at 330.

      Here, the school's relationship to the public interest mirrors the snowtube operator's position in *Hanks* in most respects: Just as the snowtube operator had to comply with public safety codes, Hotchkiss School must meet certain educational standards set by legislatures and agencies. Just as the snowtube operator provided a public space for families to enjoy time together, Hotchkiss ensures that children can learn to navigate the public world and prepares them for life outside their parents' care. Just as the snowtube operator allowed any member of the public to slide down its slopes, Hotchkiss let students from other schools join its excursion to China. And just as the snowtube operator set the terms of the release, Hotchkiss drafted its release and did not invite or permit negotiation. *See Def. Trial Ex. 616* (email informing students that they will not be allowed to enroll in the China program unless they and their parents signed the release).

6

The final two *Hanks* factors—whether release is tantamount to a contract of adhesion, and whether an entity controls the purchaser— present closer questions. In *Hanks*, patrons were presented with the release after they had already traveled to the slopes. Once there, patrons had little choice but to sign or cancel their already in-progress plans. In this case, there is no similar element of surprise; Hotchkiss presented students with the release months before they left for China. But like the patrons in *Hanks*, Cara and her parents had no meaningful exit option. If Cara wanted to go to China with Hotchkiss and enjoy all the advantages of such a trip—a journey in which she could form new friendships with her classmates, and establish long-term relationships with Hotchkiss faculty— she had to sign a release that the school argues waived her right to sue it for its failure to take basic precautions to protect her. Thus, the release was still a "take it or leave it" proposition, not "subject to the normal bargaining process," and one in which Hotchkiss enjoyed a "decisive bargaining advantage." *Hanks*, 276 Conn. at 333.

As for the school's control over risks, here too it enjoyed much of the same advantages as the snowtube operator in *Hanks*. *Hanks* and its progeny concerned recreational facilities with hazards lurking on the proprietors' properties. For example, in *Hanks* the snowtube operators oversaw maintenance to the facility's lifts and runs, and they "alone [could] properly maintain and inspect their premises, and train their employees in risk management." 276 Conn. at 331-32. And in *Reardon v. Windswept Farms*, 280 Conn. 153, the Court reasoned that a horse trainer had total control over the risks at its stables; the trainer assigned riders horses with appropriate temperaments, maintained safe corrals, and hired qualified instructors. *Id.* at 162. In contrast, Hotchkiss had no physical control over the environment that posed a risk to Cara; put bluntly, Hotchkiss could not change anything about China, the world's third largest country, home to the world's largest population.

7

But Hotchkiss still controlled Cara's exposure to the risks that China posed. Hotchkiss set the trip's itinerary. Because it is a boarding school, it largely controlled Cara's access to medical professionals and travel medicine information. *See Plain. Trial Ex. 2* (email from trip leader stating that "Hotchkiss infirmary can serve as a travel clinic, and administer many vaccinations."). Once in China, Cara was under the control of her trip leader. At trial, the trip leader, Chinese teacher Jean Yu, testified that she was a native of the Tianjin region, and that she had extensive knowledge of, and experience traveling to, the places the students visited. She also testified that students were not permitted to venture out into the city without permission and a purpose. Thus unlike Jean Yu, Cara could not run to a store to buy bug repellant on her own, and could not predict the nature of the topography and nature of the places she would encounter. Just as the snowtube operator in *Hanks* had total control over the means to protect riders from harsh conditions on its runs, and just as the horse trainer in *Reardon* had the sole ability to ensure that a child remained safe during her horseback riding lesson, Hotchkiss school's employees were in the exclusive position to evaluate the risks Cara encountered on her trip and to ensure that Cara had the resources to protect herself against those risks. *Accord Lewis*, 2012 WL 386391 (voiding Habitat for Humanity release of liability for student's cross-country bike trip).

Because this case falls logically in line with *Hanks* and similar cases, I hold that, under the totality of the circumstances presented by the facts in this case, Hotchkiss' release of liability is void as a matter of public policy.

### III.     CONCLUSION

For the reasons set forth, I hold that this release is unenforceable as a matter of law. Thus, plaintiffs' motion to exclude the release as evidence in this trial is granted.

It is so ordered.

Dated at Bridgeport, Connecticut, this 22nd day of March 2013.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge